# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

  v.                                                         Case No. 11-CR-197

ADELL SHARP,

    Defendant.

## RECOMMENDATION TO UNITED STATES DISTRICT JUDGE CHARLES N. CLEVERT, JR.

### NATURE OF THE CASE

On September 13, 2011, a federal grand jury sitting in this district returned a three-count indictment against the defendant. The indictment charged the defendant with (1) possessing with the intent to distribute 28 grams or more of crack cocaine; (2) using a firearm in furtherance of a drug trafficking offense; and (3) possessing a firearm as a convicted felon. On September 30, 2011, the defendant appeared before United States Magistrate Judge William E. Callahan, Jr. for arraignment on the indictment and entered a plea of not guilty to the charges. The case was subsequently referred to this court for pre-trial matters.

Pursuant to a pre-trial scheduling order, the defendant filed a motion to suppress physical evidence and statements on October 26, 2011. On November 16, 2011, the defendant withdrew his motion. The case was set for trial, but was adjourned on two occasions. Thereafter, the defendant re-filed his motion to suppress on April 15, 2013.

1

Pursuant to a show-cause order, the defendant explained that his motion was filed after the motion deadline due to the actions of the former prosecutor on the case. The evidentiary hearing was held on May 14, 2013. Now fully briefed and ready for disposition, the defendant's motion to suppress will be addressed herein.

## MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS

The defendant moves the court for an order excluding as evidence at trial (1) all evidence obtained as a result of the search of *XX*19 West Keefe Avenue, Milwaukee, Wisconsin, on February 2, 2011, and (2) all statements obtained as a result of the seizure of the defendant on February 2, 2011. As the basis for his motion, the defendant argues that all physical evidence should be suppressed because consent to search the residence was not given voluntarily, and all statements should be suppressed because the defendant was illegally detained.

The evidentiary hearing on the defendant's motion to suppress spanned a single afternoon. At the hearing, Officers John Ivy and Rachel Goldbeck of the City of Milwaukee Police Department (MPD) testified on behalf of the government. Citizen witness Bernadette Day testified on behalf of the defendant. The defendant also testified. Based on a careful review of the testimony presented, the stipulated facts and the parties' supplemental briefs, the court now makes the following findings of fact.

## FINDINGS OF FACT

On August 6, 2010, MPD officers received an anonymous tip that a subject known as "Skin" was engaged in "high-level drug dealing" at his residence – *XX*19 West Keefe Avenue in the City of Milwaukee – between the hours of 6:00 p.m. and midnight. See Transcript of Evidentiary Hearing [Tr.] at 9, 19. Almost six months later, on Wednesday,

2

February 2, 2011, at approximately 10:15 p.m., five MPD officers, who were in police uniforms, went to the West Keefe Avenue residence to conduct a "knock and talk" and to investigate this drug dealing complaint. (Stipulation [Stip.] No. 2, Tr. 9–10). The officers did not have a search warrant. The defendant was a resident at this home on that date. (Stip. No. 1).

Officer John Ivy knocked on the front door and spoke with an individual later identified as Bernadette Day. Officer Ivy identified himself as a police officer and informed Ms. Day that he was there to clear a drug-dealing complaint concerning that residence. (Tr. 11). The officers did not tell Ms. Day that the complaint was about six months old. Ms. Day asked the officers to go to the side/back door. Her front door was sealed with tape and plastic for the winter.[1] (Tr. 67).

Once the officers were at the side door, Ms. Day opened the door and told the officers that they could step into the common hallway. (Tr. 67). About four or five officers entered the hallway, including one female officer. (Tr. 68). Ms. Day told officers that no one else was home at the time, but she did live with a man named "Adell Sharp, her boyfriend of about a year." (Tr. 12, 56). Ms Day said that she had lived at the residence about a year. (Tr. 56). Day recalled that one male officer was holding a lot of papers which he was waving as he talked. (Tr. 69). Ms. Day testified that she assumed the papers were a search warrant. (Tr. 68, 69). She also testified that an officer mentioned something about getting dogs and she got really scared. (Tr. 69).

---

[1] Officer Ivy testified that Ms. Day asked officers to go to the side door because her front door was "barricaded." (Tr. 11). Ms. Day denied using that term. (Tr. 67). During the taped interview, Officer Goldbeck clarified that the suggested "barricade" was merely tape and plastic used to seal the front door for winter. (Hearing Exhibit 2).

3

While the officers were in the hallway, Officer Rachel Goldbeck asked Ms. Day for consent to search the residence for drugs and guns. (Tr. 41–43). Ms. Day indicated that she wanted to cooperate with the police. She consented to the search of her residence and allowed the officers to enter her residence. She signed a statement of consent in Officer Goldbeck's memo book at approximately 10:18 p.m. (Tr. 44). She signed the statement of consent before she was interviewed by Officer Goldbeck. (Tr. 73). The statement of consent reads, in relevant part:

> I Bernadette P. Day . . . give the police permission to search my residence for guns and drugs. I do not possess [sic] any guns or drugs or use illegal narcotics and want to be cooperative.

(Hearing Exhibit 1). On the statement of consent, Ms. Day crossed out the second use of "guns." She told officers that she did own a gun and that it was located inside the residence. (Tr. 60).

While speaking with Ms. Day at her side door, Officer Ivy observed an individual approach the residence. (Tr. 13). Officer Ivy made eye contact with the individual, who immediately looked down, turned his head, and quickly walked away from the door. Officer Ivy exited the residence to speak with the individual and asked him to stop. (Tr. 14). The man stopped. Officer Ivy did not display his firearm at any time during his interaction with the defendant. According to Officer Ivy, he asked the man if his name was "Adell Sharp" because Ms. Day had told the officers that she lived at the residence with Adell Sharp. The man said "no." Officer Ivy then asked him why he had come to the side/back door of the residence, but the individual did not answer that question. Tr. 14). Officer Ivy testified that he asked the individual if he knew Bernadette Day and the man stated that he did not know who she was. (Tr. 16).

4

Because of the way the individual was standing, Officer Ivy could not see the individual's hands. Given the nature of the complaint they were investigating, "high level drug dealing" at the residence, the individual's actions in attempting to distance himself as quickly as possible from the officers in the hallway, and the knowledge that firearms are often involved in drug dealing, Officer Ivy was concerned for his safety and the safety of the other officers. Therefore, Officer Ivy decided to conduct a pat-down search of the defendant for weapons. (Tr. 15). No weapons were found. (Tr. 16).

After the initial conversation with the individual and the pat-down search, the individual was escorted back to the side door of the residence. (Stip. 6). The defendant then was asked some additional questions. The defendant was asked if he lived at the West Keefe Avenue address and he indicated that he did not live there, but he came by there sometimes. (Stip. No. 8). The individual produced a Wisconsin photo identification card that indicated his name was "Adell Edwards"[2] and that he lived at the West Keefe Avenue address. (Tr. 17). After seeing the defendant's identification card, Officer Ivy asked him if he knew who Adell Sharp was and the defendant said he did not know who that was. From the time Officer Ivy exited the residence to the time his conversation with the defendant ended, approximately two minutes had elapsed.

While he was speaking with the defendant outside, Officer Ivy observed Ms. Day letting the officers inside the first floor entry door of the residence. The officers then entered the residence.

Subsequently, MPD Officer Michael Lopez exited the residence and told Officer Ivy to arrest the defendant because officers had found powder cocaine inside the

---

[2] The defendant had recently changed his name from "Adell Sharp" to "Adell Edwards." (Tr. 93–94).

5

residence. (Tr. 18). The defendant was placed under arrest and escorted to the squad of two additional officers who had just arrived at the residence. (Tr. 31–33).

After the officers found illegal narcotics and a gun inside the residence, Officer Goldbeck conducted a recorded interview with Ms. Day. (Tr. 58–59). Only Officer Goldbeck and Ms. Day were present during the interview, which began at 10:54 p.m. and was conducted in one of the guest bedrooms. (Tr. 45, 71). Prior to the start of the interview, Officer Goldbeck read Ms. Day her Miranda[3] rights. (Tr. 72-73). Ms. Day indicated that she understood these rights. (Hearing Exhibit 2). Ms. Day stated that she was informed of the nature of the complaint and that she gave consent for officers to search the residence. Ms. Day said that her name was on the lease – although the defendant paid half of the rent – and that she worked as a medical assistant at a local health care agency. No one else stayed at the residence. Ms. Day acknowledged that she signed a written consent statement. She further indicated that she crossed off the word "guns" and that she had no idea about any drugs in her residence. The interview with Ms. Day was recorded.

Ms. Day answered affirmatively when asked if the officers were polite and forthcoming. She denied being forced into doing anything and she denied that the officers had threatened her. When asked if she had anything to add, Ms. Day stated that she did not want to get into any trouble and that she wanted to keep her job. Near the conclusion of the interview, Ms. Day began crying and stated that she did not want to go to jail.

The defendant testified that he was approaching the residence at about 10:00 p.m. and when he was about eight feet from the side door, he saw an officer's hat. The

---
[3] Miranda v. Arizona, 384 U.S. 436 (1966).

defendant paused and the officer came running out of the door and called him by name, Adell Sharp.  The officer grabbed him by the arm and walked him into the hallway.  A total of three male officers were in the common hallway with the defendant.  A female police officer was not in the hallway.  He did not see her, but could hear her talking with Ms. Day.

A male officer asked the defendant if he was Adell Sharp.  The defendant then was reaching into his pocket to get his identification card which showed that his name was Adell Edwards. The officer then conducted a pat-down search. The defendant testified that the officer did not do a pat-down search of him while he was outside the residence.  Rather, he testified that the officer did not do a pat-down until he was in the hallway and was trying to get his identification card from his pocket to show the officers that his name was Adell Edwards.  The defendant recently had changed his name to Adell Edwards. The defendant testified that he was in the hallway with the officers for about 20 minutes.  During that time, one officer had a walkie-talkie and some one said they should bring in the dogs. The defendant could hear Ms. Day and the female officer talking inside the residence, but he could not understand what they were saying.  The defendant said that nobody searched the residence while he was in the hallway.   After he had been in the hallway for about 20 minutes, one of the officers told another officer to take the defendant to the squad car.

The defendant denied making the statement, "who is Adell Sharp" when the officer asked if he was that person, nor did he ever deny to the officers that he was Adell Sharp. (Tr. 101).  According to the defendant, he was asked if he was Adell Sharp and he said he was, but he was also Adell Edwards.  (Tr. 101). The defendant also testified

7

that he was not asked whether he lived at the West Keefe Avenue residence or whether he knew Ms. Day. (Tr. 102).

## **ANALYSIS**

The defendant asserts that all physical evidence obtained as a result of the search of the residence should be suppressed because Ms. Day's consent was not given freely or voluntarily. Specifically, the defendant maintains that Ms. Day was coerced into consenting to the search as the officers waved papers around (implying that they had a warrant) and threatened to bring dogs into the residence. The defendant further contends that the circumstances surrounding the search – including the time of day, the number of officers present, and the officers' failure to inform Ms. Day that she could refuse – indicate that her consent was not voluntary.

The defendant also argues that all statements obtained as a result of his seizure on February 2, 2011, should be suppressed because he was unlawfully detained. Specifically, the defendant maintains that the officers did not have reasonable suspicion to stop him and search him for weapons.

In response, the government argues that Ms. Day freely and voluntarily consented to the search of the residence. The government maintains that Ms. Day provided verbal consent to search, memorialized this consent by signing the officer's memo book, and confirmed her consent during the recorded interview. The government further contends that Ms. Day was informed immediately of the nature of the drug complaint and that she expressed a desire to cooperate with the police. The government asserts that the officers never threatened Ms. Day and that their interaction with her was straightforward and polite. The government also argues that the defendant was subjected to only a brief

8

investigatory stop. Specifically, the government maintains that the officers had reasonable suspicion to temporarily detain the defendant based on the nature of the complaint, the officer's understanding of the situation, and the defendant's evasive behavior.

**A. Physical Evidence**

Although warrantless searches generally are per se unreasonable under the Fourth Amendment, this prohibition is subject to several, specific exceptions. Mincey v. Arizona, 437 U.S. 385, 390 (1978); United States v. Robles, 37 F.3d 1260, 1263 (7th Cir. 1994). For example, law enforcement officers may conduct a search of a dwelling without a warrant "if they obtain voluntary consent either from the individual whose property is to be searched or from a third party possessing common authority or joint control over the premises." United States v. Rosario, 962 F.2d 733, 736 (7th Cir. 1992) (citing Schneckloth v. Bustamonte, 412 U.S. 218 [1973] and United States v. Matlock, 415 U.S. 164 [1974]); see also Florida v. Jimeno, 500 U.S. 248, 250–51 (1991). "The consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." Matlock, 415 U.S. at 170. Common authority "rests. . . on mutual use of the property by persons generally having joint access or control for most purposes." Id. at 171 n.7.

Where consent is obtained from a third party, the government bears the burden of proof by a preponderance of the evidence that the consenting third party possessed such authority. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). "The standard for measuring the scope of [an individual's] consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood

9

by the exchange between the officer and the [individual]?" Jimeno, 500 U.S. at 251. "The scope of a search is generally defined by its expressed object." Id. Moreover, consent searches are valid only if the consent was freely and voluntarily given. Schneckloth, 412 U.S. at 222.

The voluntariness of consent is determined based on the totality of the circumstances. United States v. Hicks, 650 F.3d 1058, 1064 (7th Cir. 2011) (citing United States v. White, 979 F.2d 539, 542 [7th Cir. 1992]). In making this fact-specific determination, courts consider various factors including

> (1) the person's age, intelligence, and education; (2) whether [the individual] was advised of [her] constitutional rights; (3) how long [the individual] was detained before [s]he gave [her] consent; (4) whether [her] consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when [s]he gave [her] consent.

United States v. Sandoval-Vasquez, 435 F.3d 739, 744 (7th Cir. 2006). A person's knowledge of her right to refuse is not a prerequisite of a voluntary consent. White, 979 F.2d at 542. However, "[b]aseless threats to obtain a search warrant may render consent involuntary." Id. Although the fragile emotional state of the individual at the time she consents is a factor in the voluntariness analysis, "the fact that a consenting party is extremely upset at the time she consents is not dispositive." United States v. Duran, 957 F.2d 499, 503 (7th Cir. 1992). Thus, "[a]bsent a showing that her emotional distress was so profound as to impair her capacity for self-determination or understanding of what the police were seeking," the consenter's fragile emotional state is not sufficient to tip the balance towards involuntariness. Id. at 503.

In this case, the government has established by a preponderance of the evidence that Ms. Day freely and voluntarily consented to the search of her residence. Ms. Day is

a middle-aged woman who has performed administrative work within the medical industry for many years.  On February 2, 2011, officers arrived at her residence to investigate a drug-dealing complaint and after a period of time, Ms. Day consented to the search and allowed the officers to enter her home. Immediately thereafter, Ms. Day memorialized her consent by signing a statement of consent in Officer Goldbeck's memo book.  In fact, Ms. Day revised the written consent statement by crossing out the word "guns" and initialling this modification.

Furthermore, after the officers found illegal narcotics inside the residence, Officer Goldbeck conducted a recorded interview with Ms. Day.  This interview took place in one of the bedrooms and did not involve any other officers.  During the interview, Ms. Day indicated that she was informed that the officers were investigating a drug complaint concerning the residence.  Ms. Day confirmed that she consented to the search of her residence because she wanted to cooperate with the police.  She stated that the officers were forthcoming and polite with her and that no one forced her to do anything.

The defendant's assertion that the officers implied that they had a search warrant and that they threatened to bring dogs into the residence is not credible.  For one, Ms. Day's testimony at the evidentiary hearing with respect to the warrant and the threat of dogs was clearly circumspect.  Ms. Day testified that she remembered "papers being waved" and that she "assumed" the papers were a search warrant.  (Tr. 68–69, 75, 77, 80).  She also testified that a male officer "mentioned something about getting dogs." (Tr. 69).  However, these allegations are inconsistent with the other evidence.

Officer Ivy testified that he may have had a copy of the anonymous complaint in his hand while talking with Ms. Day, but he denied ever mentioning a warrant or getting

11

dogs.  (Tr. 104–05).  Officer Goldbeck also testified that no one discussed getting dogs. (Tr. 58).  Moreover, Ms. Day never referenced the warrant or the dogs during her eleven-minute, recorded interview.  (Hearing Exhibit 2).  When confronted with this fact at the evidentiary hearing, Ms. Day wavered considerably, ultimately stating that "I'm almost sure that I did hear" about the dog on the tape.  (Tr. 79–83).  Ms. Day, however, acknowledged that she told Officer Goldbeck that no one ever threatened her.  (Tr. 91).

At the hearing, Ms. Day insisted that she was very scared at the time officers were at her residence.  This fear is substantiated by the recorded interview, wherein Ms. Day stated that she did not want to get into any trouble and that she wanted to keep her job. (Hearing Exhibit 2).  At the end of the interview, she audibly began to cry and sobbed, "I don't wanna go to jail."  Nevertheless, given the totality of the circumstances, this fear – although understandable – does not tip the balance in favor of finding that her consent was given involuntarily.  The other evidence dictates otherwise.  Ms. Day knew the nature of the officers' investigation before consenting to the search of her residence. She did not noticeably become distressed until the end of her interaction with the officers, which occurred nearly an hour after she had given consent and after she was informed that officers had found more than twenty-eight grams of cocaine in her residence.  Likewise, the officers' failure to inform Ms. Day of her right to refuse does not render her consent involuntary.  See White, 979 F.2d at 542.

Based on the evidence presented, the court concludes that Ms. Day freely and voluntarily consented to the search of her residence. Accordingly, the court will recommend that United States District Judge Charles N. Clevert, Jr. enter an order denying the defendant's motion to suppress with respect to the physical evidence.

12

Case 2:11-cr-00197-CNC   Filed 07/09/13   Page 12 of 18   Document 57

**B. Statements**

The defendant contends that all statements he made should be suppressed because the officers illegally detained him when he approached the West Keefe Avenue residence. The defendant further maintains that the officers lacked reasonable suspicion to stop him and, therefore, his statements must be suppressed. The defendant is not challenging the legality of his arrest. In opposing the motion, the government asserts that "the testimony presented at the evidentiary hearing confirms that Sharp was subject to, at most, an investigatory detention during the search." (Government's Supplemental Memorandum in Opposition to the Defendant's Motion to Suppress at 5.)

The law is well established that an encounter between a law enforcement officer and a citizen implicates the Fourth Amendment only if the officer seizes the citizen. United States v. Mendenhall, 446 U.S. 544, 551–55 (1980); Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Consequently, the United States Supreme Court has developed three categories for police-citizen encounters and the Fourth Amendment requirements imposed on each:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

United States v. Johnson, 910 F.2d 1506, 1508 (7th Cir. 1990) (internal citations omitted).

13

"The proper test for determining whether a given police-citizen contact rises to the level of a Fourth Amendment seizure is an objective one." United States v. Espinosa-Alvarez, 839 F.2d 1201, 1205 (7th Cir. 1987). Thus, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Mendenhall, 446 U.S. at 554; United States v. Williams, 945 F.2d 192, 196 (7th Cir. 1991). If "a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no [justification] is required." Florida v. Bostick, 501 U.S. 429, 434 (1991) (internal citation omitted).

Law enforcement officers do not need any justification when the police-citizen encounter is consensual in nature (e.g., limited to questioning about an individual's identity). See I.N.S. v. Delgado, 466 U.S. 210, 216–17 (1984); Florida v. Royer, 460 U.S. 491, 497 (1983). [M]ere police questioning does not constitute a seizure." Florida v. Bostick. 501 U.S. 429, 434 (1991). Therefore, law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place and asking him if he is willing to answer some questions [or] by putting questions to him if the person is willing to listen. Id.

Thus, the officer's command and initial questions did not constitute a Fourth Amendment "seizure. However, the defendant was "seized" when Officer Ivy conducted the pat-down search for weapons outside the residence. See Terry v. Ohio, 392 U.S. 1, 27 (1968).

In Terry v. Ohio, 392 U.S. 1, the Court held that the petitioner was "seized" under the Fourth Amendment when the officer in that case subjected him to a pat-down search.

14

Law enforcement officers may conduct a brief investigatory stop and a limited pat-down search of individuals subject to investigatory detention in order to determine whether that person is, in fact, carrying a weapon and to neutralize the threat of harm. Id. at 24-27. Thus, a police officer may conduct a reasonable search for weapons for his safety "where he believes that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the defendant for a crime." Id. at 27. To conduct a brief, investigatory stop of a suspect, the police officer must have knowledge of "specific and articulable facts which, taken together with the rational inferences from those facts" could cause them to conclude in light of their experiences that criminal activity was afoot. Id. at 1, 21, 30; see also Alabama v. White, 496 U.S. 325, 329-30 (1990).

"Reasonable suspicion, like probable case, is dependent upon both the content of the information possessed by the police and its degree of reliability." Alabama, 496 U.S. 330. "'Reasonable suspicion' must be based on some objective manifestation that the subject is involved in criminal activity." Unites States V. Wimbush, 337 F.3d 947, 949 (7th Cir. 2003) (other citation omitted).

Moreover, police can sometimes consider otherwise innocent behavior in determining whether reasonable suspicion exists to detain a defendant. Id. at 22-23. As the Court pointed out in Illinois v. Wardlow, 528 U.S. 119, 125 (2000), the conduct involved in Terry – two men pacing back and forth outside of a store, at times looking in the window and periodically conferring – was ambiguous and subject to innocent interpretation. All of the conduct by itself was lawful, but it also suggested that the

15

individuals were casing the store for a possible robbery. The Court noted that "Terry recognized that the officers could detain the individuals to resolve the ambiguity." Id.

Reasonable suspicion requires less information than probable cause, but an officer still must rely on specific, articulable facts instead of a mere hunch. United States v. Booker, 579 F.3d 835, 838 (7th Cir. 2009). "Whether an officer has a reasonable suspicion to support a Terry frisk is a fact-specific inquiry that looks at the totality of the circumstances in light of common sense and practicality." United States v. Robinson, 613 F.3d 804. 807-08 (7th Cir. 2010).

In this case, Officer Ivy testified that, while speaking with Ms. Day at the side door of her residence, he observed an individual approach the side door. Officer Ivy stated that when their eyes met, the individual looked down immediately, turned his head away and quickly walked away from the side door of the residence.

While he was speaking to Ms. Day at the side door, he observed an individual approach the side door to the residence. Officer Ivy stated that when their eyes met, the individual looked down immediately, turned his head and walked briskly away from the side door. Due to the individual's unusual and quick manner in moving away from the side door, Officer Ivy exited the residence to speak to him. Because of how briskly the individual was walking, the individual had already passed the front threshold of the residence, and Office Ivy asked the individual to stop. The individual complied. According to Officer Ivy, he asked the individual if his name was "Adell Sharp," and the individual responded "no." Officer Ivy asserts that he asked the individual why he had come to the back door of the residence and the individual did not answer. The defendant disputes that he denied he was Adell Sharp and refused to answer the

16

questions. Shortly after the initial encounter, Officer Ivy conducted a pat-down search of the defendant outside the residence. This encounter and pat-down search took about two minutes.

Officer Ivy indicated that he conducted the pat-down search of the defendant because of his concerns for officer safety. Officer Ivy stated that he had officer safety concerns based on the nature of the complaint about high level drug dealing at the residence, the fact that guns and drugs often go hand in hand, and the defendant's actions. The defendant came to the side/back door of the residence that night and when he saw the uniformed officers in the hallway, and made eye contact with Officer Ivy, he immediately moved to distance himself from the door. Officer Ivy also was concerned because he could not see the defendant's hands. The defendant acknowledged that he had his hands in his pocket to get his photo identification card to show to the officer just prior to the pat-down search. According to Officer Ivy, the defendant also had refused to answer the question as to why he had come to the side door of the residence that evening. (Tr. 28–30).

Also, at this time, the officers were not clear as to who the defendant was and did not know his name. They did know, however, that a man named "Adell Sharp" lived at the residence with Ms. Day.

Officer Ivy presented knowledge of specific and articulable facts which, taken together with the rational inferences from those facts provided some objective manifestation that the defendant is or might be involved in criminal activity. His pat-down search was justified by his concern for the safety of himself and the other officers.

Accordingly, the court will recommend that the district judge enter an order denying the defendant's motion to suppress with respect to his statements.

## **CONCLUSION**

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that the United States district judge enter an order **denying** the defendant's motion to suppress physical evidence. (Docket #35).

**IT IS ALSO RECOMMENDED** that the United States district judge enter an order **denying** the defendant's motion to suppress his statements.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A), (B) and (C) and Fed. R. Crim. P. 59(a) and (b)(2) (as amended effective December 1, 2009), whereby written objections to any order or recommendation herein or part thereof may be filed within fourteen days of service of this recommendation and order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal.

Dated at Milwaukee, Wisconsin, this 9th day of July, 2013.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge